IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JILL MOORE and JIM MOORE, | ) | |
| as Statutory Beneficiaries of A.M., | ) | |
| and on behalf of the Estate of | ) | |
| A.M., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-424-WKW |
| | ) | [WO] |
| CHILTON COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The parents of A.M., Jim and Jill Moore, have sued the Chilton County Board of Education, the governing board of the high school where their teenaged daughter attended until May 12, 2010, when tragically she jumped to her death from an interstate overpass. This action proceeds on a claim under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a), that the Board had actual notice of peer-on-peer disability harassment against A.M. but acted with deliberate indifference to the harassment. Before the court is the Board's motion for summary judgment (Doc. # 35), which has been fully briefed (Docs. # 36–46, 56–57, 60). After

careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that the motion is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a Rule 56 motion, the court views the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can fulfill its initial burden by identifying the portions of the record illustrating the absence of a genuine dispute of material fact or, alternatively, by showing that the materials cited by the non-movant do not establish the presence of a genuine dispute or that the non-movant "cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477

U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  FACTS AND PROCEDURAL HISTORY

**A.** **<u>Facts</u>**

On Wednesday, May 12, 2010, the Moores suffered every parent's worst nightmare when they learned that earlier that morning, their daughter had not gone to school but had taken her own life by jumping from an overpass bridge above Interstate 65 in Chilton County, Alabama.  A.M. was fifteen years old at the time and in the tenth grade at Jemison High School.  A suicide note, typed on the family computer, read:

> Dear Mom and Dad,
>
> I'm leaving today.  I'm taking my own life.  I'm killing myself because I can't take this crap anymore.
>
> Eli, the local law enforcement, Lola, Leslie, Joab, etc. – this is all the crap that's making me do this.
>
> Don't try to stop me.  By the time you find this letter, I'll be dead.  It's not your fault.  But do not worry.  Rejoice because I will be with Him.
>
> Soon, I will return, but in a different form.

(Compl. ¶ 16; Jim Moore's Dep. 63–67; Jill Moore's Dep. 48–50, 74–76.)[1]

---

[1] A.M.'s sister, Lesley, died by electric shock from a downed power line the year before, and Eli was A.M.'s deceased sister's boyfriend, whom A.M. blamed for her sister's death.  Joab, A.M's cousin, was shot to death by his peers several years before A.M. died, and Lola was

The Moores were shocked by the unfathomable loss of their child. They had no idea that A.M. had suicidal tendencies, and they had no idea that anything at school was troubling her. Save one instance during her tenth-grade year when A.M. told her dad that students had been "pick[ing] on" her on the school bus, A.M. had never complained to her parents of any peer-on-peer bullying. (Jill Moore's Dep. 162.) Rather, A.M. typically responded with a perfunctory "fine" when her parents asked about her day at school. (Jim Moore's Dep. 163; Jill Moore's Dep. 25.) But after A.M.'s death, the Moores began to suspect that their daughter had become despondent based upon persistent teasing from her peers about her weight and the fact that she walked with a limp. (Jim Moore's Dep. 163.)

A.M. was a "little overweight," as described by her father. (Jim Moore's Dep. 135.) At the time of her death, A.M. weighed approximately 225 pounds (Avery's Dep. 15) at an estimated height of 64 inches (Jill Moore's Dep. 51). A.M.'s friend described her as a "big girl," somewhere "in the middle range of skinny and big." (Virginia's Dep. 17.) The assistant principal said that A.M. "was perhaps clinically overweight," but she "was not severely obese." (Assistant

---

A.M.'s dog, which A.M. saw get hit by a car and die. (Jill Moore's Dep. 30, 36, 48–49, 50.) The Board cites A.M.'s note for its absence of any statement of peer-on-peer bullying at school.

Principal Donna Giles's Aff. 3; *see also* Joann Lewis's Dep. 20 (A.M.'s bus driver who describes A.M. as "heavy but not extremely heavy").)

In addition to being overweight, when A.M. was eight or nine years old, she was diagnosed with Blount's Disease.  (Jim Moore's Dep. 86, 89.)   Blount's Disease is a "progressive disorder of the proximal growth plate of the tibia, resulting in a range of bowing deformity of the legs."  (Report of Michael D. Freeman, Ph.D., at 2 (Doc. # 48-1).)  A.M.'s medical records confirm that A.M. had "progressive juvenile onset tibia vera," also known as Blount's Disease, and that at age ten – the summer before her fifth grade year – she underwent surgery for her tibia vera to treat her "rapidly progressive bowleggedness" and "obvious stance deformity of the left knee."  (Medical Records 37, 86–87.)  During the beginning of her fifth grade year, as a result of the surgery, A.M. used a wheelchair and then a walker.  (Jill Moore's Dep. 43–45.)  It is undisputed that, after her fifth-grade year, A.M. did not require the use of any walking aid, such as a leg brace, cane, crutches, walker, or wheelchair.

Mr. Moore, A.M.'s father, testified, however, that, even after the surgery up until the time of her death, A.M. "walked with an unusual gait because of her knee" and that A.M. "could not run and jump."  (Jim Moore's Dep. 173; *see also* Jim Moore's Dep. 177 (A.M. "walked with a limp.").)  One of A.M.'s friends at school, Virginia, described A.M. as having "big legs" that were "a little outward instead of . . . inward and straight," and said that A.M. walked with a noticeable

limp as if "one of [her] legs was shorter than the other." (Virginia's Dep. 19–22; *see also* Lewis's Dep. 20 (observing that A.M.'s "hips were kind of stiff" when she walked).)

In 2008, when A.M. entered Jemison High School in the ninth grade, other students began teasing her because of her weight and her awkward way of walking. Two of A.M.'s peers at Jemison High School, Virginia and Brandon, describe the harassment that A.M. endured. Virginia became good friends with A.M. when Virginia was in the eleventh grade and A.M. was in ninth grade. (Virginia's Dep. 16, 93, 96.) They had several classes together and would sit together in the cafeteria when their schedules permitted. (Virginia's Dep. 16, 96–97, 139–40.) According to Virginia, during A.M.'s ninth- and tenth-grade years, students made fun of A.M. because of the way she walked and "especially [because of] her weight." (Virginia's Dep. 24.) These students mainly were cheerleaders and football players. (Virginia's Dep. 41, 60.) The cheerleaders would call A.M. "ugly names," such as "fat ass" and "fat bitch." (Virginia's Dep. 41, 104.) The name-calling "happened a lot, just about every day" during the two school years preceding A.M.'s death. (Virginia's Dep. 41, 48.) Virginia identifies by name one cheerleader who made fun of A.M., but she knows that there were more "than just this one." (Virginia's Dep. 102, 108.) Additionally, Virginia observed football players and "some boy basketball players" call A.M. a "fat ass" and "fat bitch" and

make "fun of her walk." (Virginia's Dep. 41–42.) Virginia identified by name a few of these alleged bullies. (Virginia's Dep. 79–81, 102, 147–48.)

Virginia recalled that in A.M.'s ninth-grade year, "a couple of times" when the two of them would walk together down the hallway and would pass "big groups" of students, those students "would talk about [her] and A.M.," but Virginia could not remember the names of those students nor did she indicate what these students said. (Virginia's Dep. 145–46.) Virginia did recount some specific incidents, however, and named some students who harassed A.M. (Virginia's Dep. 79, 80.) For instance, on one occasion, a male student, whom Virginia identified by name, was standing in the hallway with a "big group" of students and made fun of A.M. as they walked by. That student made fun of A.M.'s limp and called her fat. (Virginia's Dep. 147–48.) On several other occasions, another male student would tease A.M. about her limp and her "look[s]" as she and Virginia passed by him in the hallway. (Virginia's Dep. 149–50.) On another occasion during A.M.'s tenth-grade year, a female student, who was hanging out with a group of students in the hallway, harassed A.M. about the "way [she] walked and the way she talked." (Virginia's Dep. 152.) In response to the constant name-calling, A.M. would either ignore it or tell the perpetrators to "shut up" or "mind their own business." (Virginia's Dep. 40, 148.) Other than name-calling directed at A.M., Virginia recalls an incident where A.M. dropped her books and other students laughed "because [A.M.] had to bend over and pick them up." (Virginia's Dep.

7

39.)  Virginia also recalls that a few kids helped A.M. pick up her books.  Virginia did not report to a teacher or school administrator any of the "incidents where [she] overheard students in the hallway making comments about [A.M.] as [they] walked past."  (Virginia's Dep. 168.)

The name-calling occurred primarily in the hallways – in between classes, in the morning, and after school.  (Virginia's Dep. 45, 103.)  Virginia did not witness any student bully A.M. in the classroom.  (Virginia's Dep. 46.)  Virginia noted that teachers and other school employees likely would not have heard the other students' comments because most of the teasing occurred in the hallways while the teachers were in their classrooms getting ready for the next class and that any teasing would cease temporarily if a student saw a teacher in the vicinity. (Virginia's Dep. 43–44.)  Virginia did not recall that any teacher on a regular basis stood in the hallways to monitor student activity (Virginia's Dep. 43–45), and Virginia testified that, in the cafeteria, the teachers generally sat together at a separate table, thereby permitting another venue for peer-on-peer bullying to go undetected.  (Virgina's Dep. 50–51.)

At some point, Virginia told some of the teachers that A.M. was "getting bullied a little bit," but these teachers said, "[J]ust let [A.M.] walk away" and "ignore it," but told Virginia that if the teasing got worse to "take it to the office and tell the principal."  (Virginia's Dep. 52.)  Virginia did not remember the names of any of the teachers who made those comments.

8

Virginia did identify one teacher, Jill Easterling, whom she told about A.M.'s bullying.  (Virginia's Dep. 53, 55.)  Although Virginia cannot remember the specifics of what she told Ms. Easterling, she remembers that after that conversation, Ms. Easterling would "watch[ ] over [A.M.]" from her classroom door while A.M. was in the hallway.  (Virginia's Dep. 54, 55.)  Virginia did not know, however, if Ms. Easterling ever relayed what she told her to any school administrator.  (Virginia's Dep. 54.)  Virginia also did not have any personal knowledge of whether A.M. had reported to a teacher or other school official that she was the target of bullying.  (Virginia's Dep. 57.)  Virginia observed that some teachers would allow A.M. to stay in the classroom until a few minutes before the next bell rang, but Virginia did not know why, and Virginia said that it was not unusual for a student to seek permission to stay in a classroom between classes. (Virginia's Dep. 72–74.)  Virginia was shocked to learn that her friend, A.M., had committed suicide, as A.M. had never confided in her any suicidal ideations. (Virginia's Dep. 130.)

Brandon, one of A.M.'s classmates, also gave deposition testimony about the bullying A.M. endured at Jemison High School.  He was one of the bullies. Although Brandon did not notice anything unusual about A.M.'s walk, he ridiculed her because she was overweight.  (Brandon's Dep. 12, 21, 54.)  Beginning in A.M.'s freshman year, Brandon picked on A.M. "about her size."  (Brandon's Dep. 39.)  He picked on her "every day" on the bus, in the hallways, and in the

9

lunchroom.   (Brandon's Dep. 38–39.)   Brandon said that A.M. typically would ignore him.

During their ninth-grade year, Brandon also overheard other students call A.M. "fat," "fat ass," and "fat bitch."   (Brandon's Dep. 35–36.)   In their tenth grade year, Brandon saw other students bully A.M. "from time to time" either in the hallways or in the cafeteria.  (Brandon's Dep. 48.)  He recollects that bullying generally occurred in the hallways, not in the classroom, that bullying was not as intense when he was in the tenth grade, but that he witnessed "some" incidents of bullying against A.M. that year.   (Brandon's Dep. 30–31, 48–49.)   He also continued to bully A.M. in the tenth grade, but not within plain sight of teachers. (Brandon's Dep. 52.)  He said that all of his bullying against A.M. was because of her weight.  (Brandon's Dep. 72.)

Brandon also identifies two of his peers who in tenth grade bullied A.M. on a "nearly a daily basis" in the gym by "making fun of her size" and her weight. (Brandon's Dep. 59, 61, 132, 134)  Brandon says that the gym provided a prime opportunity for teasing because the physical education teacher, Leighsa Robinson, spent the majority of class in her office, which was not in the gym.  (Brandon's Dep. 63.)

Moreover, the school quarter in which A.M. died, Brandon and A.M. were in a class together, called Life (Lifelong Individualized Physical Education).[2] Ms. Robinson was the teacher, and the class met in the gym where the students played games largely unsupervised. (Brandon's Dep. 54, 133–34.) In this class, during the weeks preceding A.M.'s death, Brandon would say things to A.M., "making fun of her weight and size." (Brandon's Dep. 54.) Ms. Robinson stayed in her office most of the time and would come out only periodically to check on the students; hence, again, the gym provided an easy forum for Brandon to pick on A.M. without getting caught. (Brandon's Dep. 55–56, 98.) There were three other students in Life class who also picked on A.M. on an "almost" daily basis, calling her names like "fat bitch," "fat," or "fat ass." (Brandon's Dep. 98, 133–39.) On one occasion, Brandon recalls that during Life class another student called A.M. a "fat ass" and "fat bitch" and told her that she "needed to change classes because nobody liked her." (Brandon's Dep. 142.) A.M. just sighed, shook her head, and walked away. (Brandon's Dep. 142–43.) Not surprisingly, since he was one of the perpetrators, Brandon never reported the bullying A.M. endured to any school official. (Brandon's Dep. 65, 146.)

---

[2] Ms. Robinson says that A.M. participated in this class during her first semester during her tenth-grade year, and that Brandon was not a student in that class because she taught only female students in her physical education classes. (Robinson's Aff. 2.) For summary judgment purposes, Brandon's testimony that he and A.M. were in a physical education class together in the weeks preceding her death is accepted as true.

Brandon testified that he particularly enjoyed teasing A.M. on the school bus, and he did so during their ninth- and tenth-grade years.  He sat at the back of bus, and A.M. sat in the row diagonally in front of him.  (Brandon's Dep. 40, 123–24.)  He would most often call A.M. "fat" or "fatty," but a time or two, he called her "fat ass."  (Brandon's Dep. 128, 130.)  A.M. ignored him, but finally, one day in the tenth grade, A.M. turned around and told him to "shut up," and he did at least for that bus trip.  (Brandon's Dep. 128–29.)  Brandon also recalls one other occasion after that when she told him to "shut up."  (Brandon's Dep. 129.)  Ms. Lewis, the bus driver, occasionally would pull the bus over to the side of the road and would tell the students to be quiet so that she could pay attention to the road and make sure everyone got home safely, but she would not mention bullying specifically, and Brandon could only speculate that bullying, versus other bad behavior, was the reason.  (Brandon's Dep. 43–44, 50.)

In tenth grade, A.M. told her father that students "picked on" her on the school bus and that Brandon was the main bully.[3]  (Jim Moore's Dep. 132–34.) Mr. Moore discussed the matter with Brandon's mother, who assured him that she would handle it.  (Jim Moore's Dep. 133, 135, 136.)  After Mr. Moore's conversation with Brandon's mother, A.M. did not complain to him again about being teased on the bus, and he assumed that the situation had resolved itself.  (Jim

---

[3] Mr. Moore did not indicate whether A.M. provided any details about the nature of the teasing.

12

Moore's Dep. 135–36.)  Mr. Moore did not mention A.M's complaint to the bus driver or to any school official (Jim Moore's Dep. 136), but Mrs. Moore did talk to the bus driver (Jill Moore's Dep. 100).  Ms. Lewis responded that she was aware that there "was a problem" (Jill Moore's Dep. 100), but Mrs. Moore does not know what actions, if any, the bus driver took to help stop the teasing.  (Jill Moore's Dep. 100.)  Neither Mr. Moore nor Mrs. Moore ever lodged a complaint with any school official about bullying.  (Jill Moore's Dep. 162–63.)  In fact, as stated, the Moores essentially were unaware it was happening.

Ms. Lewis says that A.M. never complained to her that any student was picking on her and that she (Ms. Lewis) never witnessed any student bully A.M. (Lewis's Dep. 37–38, 49; Lewis's Aff. 4.)  At some point during the 2009–10 school year (A.M.'s tenth-grade year), however, Ms. Lewis either heard about or saw Brandon "picking on A.M."  (Lewis's Aff. 4; Lewis's Dep. 31, 35.)  Ms. Lewis does not remember the specific circumstances surrounding what she heard, saw, or was told, but she says that she moved Brandon to the seat behind hers for approximately two weeks.  (Lewis's Aff. 4; Lewis's Dep. 32.)  After the two-week period, upon Brandon's request and his assurance that he and A.M. had resolved their differences, Ms. Lewis permitted him to move back to his seat at the back of the bus.  (Lewis's Aff. 4–5.)  After that, Ms. Lewis "never saw any misconduct by [Brandon] directed at A.M."  (Lewis Aff. 5.)  Ms. Lewis did not advise the school

administration of the situation since she felt that she "had taken care of it."[4] (Lewis's Aff. 5; *see also* Lewis's Dep. 22–24.)

Brandon also got in trouble once – either in the his ninth- or tenth-grade year – for bullying another girl whom he teased because she had a nervous tic. (Brandon's Dep. 70, 72.)  That girl reported him to Assistant Principal Giles, and Ms. Giles lectured Brandon on bullying and told him he "needed to stop." (Brandon's Dep. 72–78.)  And on another occasion "close to" the end of Brandon's tenth-grade year, Principal Alan Thompson required Brandon to serve twenty days in alternative school at the beginning of his eleventh-grade year as punishment for teasing a different girl about her weight.  (Brandon's Dep. 84–87.)

Ms. Giles never received a report from the principal,[5] A.M.'s guidance counselor, or A.M.'s STEP[6] teacher that A.M. had complained to them of any problems related to bullying, nor did Ms. Giles ever receive a complaint from A.M.

---

[4] Ms. Lewis testified that requiring an older student to sit at the front of the bus, where the younger students sat, was "heavy punishment," that the Board imposed limits on her disciplinary authority, and that she imposed on Brandon the "maximum punishment" within her authority.  (Lewis's Dep. 32.)  Ms. Lewis also testified that the governing policies did not require her to report a single incident of misconduct, but that she would have been required to report any further incidents involving Brandon and A.M.  (Lewis's Dep. 35–36.)  Had Ms. Lewis learned of any other incidents, she would have "carried [Brandon] to the assistant principal or the principal."  (Lewis's Dep. 36.)

[5] Mr. Thompson, the principal, is now deceased.  (Giles's Aff. 1.)

[6] STEP is an acronym for "Student Teacher Empowerment Program," a program "designed to provide high school students with a small group . . . and a teacher advocate" for purposes of providing students "with instruction related to academic, personal[,] and career issues."  (Giles's Aff. 3.)

herself.  (Giles's Aff. 3, 6.)  While Ms. Giles occasionally spoke with Mrs. Moore about A.M. on issues unrelated to this litigation, Mrs. Moore never informed Ms. Giles of "any complaints that A.M. was being bullied or harassed at school." (Giles's Aff. 4.)  A.M. also never reported any acts of harassment by her peers to Victor Rodriquez, who was her graduation coach with whom she met one-on-one every other day during her years at Jemison High School.  (Rodriquez's Dep. 11, 12, 18, 29.)

## B.   Procedural History

After A.M. committed suicide, Plaintiffs filed this lawsuit against the Board.[7]  The governing Complaint asserts three claims arising under federal law. Count I asserts a Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983 premised on the Board's failure to prevent peer-on-peer bullying. Count II alleges discrimination on the basis of disability, in violation of § 504(a). Count III alleges that the same facts that give rise to a § 504(a) violation also constitute a violation of Title II of the ADA.

A prior Memorandum Opinion and Order narrowed the counts.  (Doc. # 19.) Count I was dismissed for failure to state a claim; hence, this action proceeds only as to Counts II and III.

---

[7] Plaintiffs are proper parties to bring this suit pursuant to § 6-5-391 of the Alabama Code.  (*See* Doc. # 57, at 5.)

## IV. DISCUSSION

Counts II and III allege claims under Title II of the ADA and Section 504(a), both of which address discrimination against disabled students.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504(a) provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Under § 504(a), Plaintiffs must prove that the Board "intended to discriminate against [A.M.] on the basis of [her] disability." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 604 (11th Cir. 2010) (citation and internal quotation marks omitted). The Eleventh Circuit has held that "the same standards govern discrimination" under § 504(a) and the ADA. *Id.*  Based upon this circuit authority, the court will analyze the ADA and Section 504 claims together as the parties have.

At the motion-to-dismiss stage, consistent with the parties' approach, the court analyzed the ADA and § 504(a) disability harassment claims under the framework established in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), a peer-on-peer sexual harassment case brought under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).  The parties continue to rely

on *Davis*'s framework, and the court will do the same. *Davis* held that under Title IX, schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Applying *Davis* to peer-on-peer disability harassment claims under the ADA and § 504(a), the court finds that the plaintiff must satisfy the following five elements:

> (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment.

*Long v. Murray Cnty. Sch. Dist.*, No. 10cv15, 2012 WL 2277836, at *26 (N.D. Ga. May 21, 2012) (observing that "courts have applied the case law and reasoning governing Title IX peer-on-peer sexual harassment claims to § 504 and ADA peer-on-peer disability harassment claims (collecting cases)), *aff'd*, 522 F. App'x 576 (11th Cir. 2013).[8]  The deliberate indifference standard articulated in *Davis* has been described as having "considerable bite," as it requires that the defendant have

---

[8] The Board also points out that the Eleventh Circuit's affirmance in *Long* occurred after this court's ruling on the earlier-filed motion to dismiss and that notably, the Eleventh Circuit did not disturb the district court's application of *Davis*, also an ADA/§504(a) peer-on-peer disability harassment case. *See Long*, 522 F. App'x at 577 n.1 ("Because both parties effectively agree that the deliberate indifference standard set forth in *Davis* . . . should apply to the § 504 and ADA claims, we find that the district court was correct" to borrow *Davis*'s five-element framework.).

actual notice of the alleged harassment. *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011).

The Board challenges Plaintiffs' ability to survive summary judgment on all five elements. For the reasons that follow, the Board has demonstrated that there is no genuine dispute of material fact with respect to the fourth and fifth elements. Some discussion of the first, second, and third elements follows, but as to those elements, the court assumes without deciding that Plaintiffs can meet their summary judgment burden.

## A.   Disability

As relevant here, the ADA defines an individual with a "disability" as one who has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Section 504(a) employs a virtually identical definition. *See* 29 U.S.C. § 706(8)(B)(i). Plaintiffs contend that A.M. suffered impairments because of her Blount's Disease and her "weight" and that A.M. was substantially limited in her ability to "run or jump." (Doc. # 57, at 11.) The Board asserts that Plaintiffs have not shown that A.M. suffered from a physical or mental impairment or that running and jumping are major life activities. The arguments are addressed in turn.

### 1.   *Physical or Mental impairment*

The ADA's implementing regulations define "physical or mental impairment" as

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2011).[9]

### a.    Blount's Disease

The Board does not challenge that under the ADA, Blount's Disease qualifies as an impairment, and it also admits that "the medical records show that A.M. suffered from Blount's Disease in her left leg in her elementary school years." (Doc. # 46, at 14.)  The Board argues, however, that the medical records do not prove that A.M. "suffered from Blount's Disease after the surgery or that Blount's Disease impacted A.M. any during the time she was a student at JHS." (Doc. # 60, at 19.)  The Board emphasizes that A.M. underwent *corrective* surgery in June 2005, required only temporary wheelchair assistance in the fifth grade, and had not visited her treating physician since March 2006.

The gist of the Board's argument is that there is a lack of medical evidence of a post-operative diagnosis of Blount's Disease.  Although the medical evidence

---

[9] While § 1630.2 is a regulation promulgated by the Equal Employment Opportunity Commission with respect to Title I of the ADA involving employment discrimination cases, the regulation is instructive for this case.

in the summary judgment record ends in March 2006, that evidence suggests that post-surgery, A.M. continued to suffer some physical effects from Blount's Disease.  For instance, the clinic note from A.M.'s treating physician, dated nine months after A.M.'s surgery, denotes A.M.'s "diagnosis" as "follow up tibi vara," and, while providing that A.M. was recovering well, also documented "[s]light residual deformity."  (Doc. # 45-1, at 17.)  Moreover, even if A.M. did not retain a formal diagnosis of Blount's Disease after her surgery, a diagnosis is not synonymous with a disability.  *See Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)), *superseded in part by statute*, ADA Amendments Act of 2008, Publ. L. 11–325 (2008)).  Here, there is sufficient evidence to create a genuine dispute of material fact whether A.M. had a qualifying impairment.

Mr. Moore, A.M.'s father, testified that, after the surgery and until the time of her death, A.M. "walked with an unusual gait because of her knee."  (Jim Moore's Dep. 173; *see also* Jim Moore's Dep. 177 (A.M. "walked with a limp.").)  Moreover, one of A.M.'s classmates confirms that A.M. walked with a "limp," that her legs bowed a "little outward," and that it appeared that "one of [A.M.'s] legs was shorter than the other."  (Virginia's Dep. 19.)  The Board points to other

20

evidence, such as Mr. Moore's testimony that he and A.M. spent time together fishing, deer hunting, and visiting state parks.  (Jim Moore's Dep. 38–39.)  The Board also relies on affidavits from school officials indicating their lack of knowledge that A.M. suffered any physical limitations (Giles's Aff. 2; Lewis's Aff. 3–4) and an affidavit from A.M.'s physical education teacher that A.M. was able to walk the daily required one mile (Robinson Aff. 2).  Notwithstanding the conflicting evidence, the court finds that A.M. has presented sufficient evidence that raises a genuine dispute of material fact regarding whether she had a qualifying impairment as a result of her early childhood diagnosis of Blount's Disease.

### b.    Weight

It is unclear if Plaintiffs are alleging that A.M.'s weight (225 pounds at 64 inches tall) amounts to an additional disability or that it is a side effect of her Blount's Disease.[10]  (*Compare* Doc. # 1, at 56, *with* Doc. # 57, at 12.)  Whether obesity qualifies as an impairment under the ADA is undecided in this circuit.  *See Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1264 (11th Cir. 2007)

---

[10]   The Moores do not contend that A.M. suffered from an eating disorder (Jim Moore's Dep. 81, 172; Jill Moore's Dep. 142), and there is no contrary evidence.  Accordingly, the allegation in the Complaint that A.M. was disabled because of an eating disorder finds no evidentiary substantiation in the summary judgment record; thus, this opinion does not address the allegation.

(declining to decide in a pre-ADAAA[11] case whether the plaintiff suffered from an impairment based upon his obesity because regardless the plaintiff could not show that he was substantially limited in a major life activity); *see also Lescoe v. Pa. Dep't of Corrs. SCI-Frackville*, 464 F. App'x 50, 53 (3d Cir. 2012) ("[T]his Court has not definitively reached a position regarding whether obesity is a disability under the ADA that limits a major life activity.").[12]

The Board focuses its summary judgment argument, not on whether obesity is a qualifying impairment under the ADA, but rather on the alleged absence of evidence that A.M. was obese in the first place.  (Doc. # 46, at 11.)  It also objects to the admissibility of Plaintiffs' belatedly disclosed printout from the Centers for Disease Control and Prevention's online BMI Percentile Calculator for Child and Teen, indicating that A.M.'s weight based upon her height and age rendered her "obese."  (*See* Doc. # 56-6.)  Other than offering the BMI calculator results, Plaintiffs do not discuss the threshold issue of whether A.M.'s extra pounds would qualify as an impairment.  (*See* Doc. # 57, at 11.)  Because this issue is not adequately briefed by either party and because other aspects of the analysis are dispositive, the court will assume, without deciding, that Plaintiffs have

---

[11] The ADA Amendments Act of 2008 ("ADAAA") broadened the definition of disability under the ADA.  *See* ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553 (codified as amended in scattered sections of 42 U.S.C.).

[12] Pre-ADAAA, the EEOC's regulations provided that "except in rare circumstances, obesity is not considered a disabling impairment."  29 C.F.R. Pt. 1630, App., § 1630.2(j).  That language has been removed.

demonstrated that A.M. had impairments – associated with Blount's Disease and her excessive weight – within the meaning of the ADA.

### 2.   *Substantial Limitation in a Major Life Activity*

Plaintiffs contend that A.M. was substantially limited in her ability to "run or jump."  (Doc. # 57, at 11; *see* Jim Moore's Dep. 173 (A.M. "could not run and jump."); Jim Moore's Dep. 177 (A.M. "could not run without pain.").) The Board does not refute the evidence that A.M. could not run or jump.  It argues, however, that "running and jumping are not major life activities," in particular because these activities do not "impact a high school student's ability to receive an education." (Doc. # 60, at 17.)

The ADA provides a list of "major life activities," which "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[13]   42 U.S.C. § 12102(2)(A) (defining chapter terms).  An individual is substantially limited in a major life activity if he or she is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."   29

---

[13] Major life activities also include "major bodily functions," which are not at issue here.

C.F.R. § 1630.2(j)(1)(ii).  A substantial limitation in one major life activity is sufficient.  *See Shepard v. United Postal Serv., Inc.*, 470 F. App'x 726, 729 (11th Cir. 2012).

The EEOC implementing guidelines, *see supra* note 9, provide a comprehensive definition of "substantially limits" in favor of "expansive coverage":

> The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(2011).  This expansive coverage does not, however, relieve a plaintiff of his or her burden to "offer[ ] evidence that the extent of the limitation caused by the impairment is substantial."  *Hunter v. U.S. Postal Serv.*, 535 F. App'x 869, 872 (11th Cir. 2013) (citation and internal quotation marks omitted).

Although running and jumping are not included in the statutory list of major life activities, neither party has argued that the omission is fatal, presumably because the list is expressly non-exhaustive.  The parties do not cite any Eleventh Circuit or other circuit authority addressing whether running or jumping is a major life activity under the ADAAA, and there is a dearth of post-ADAAA case law in

any circuit on this issue.[14]   Pre-ADAAA, the answer was not clear in this circuit. *See Fornes v. Osceola Cnty. Sheriff's Office*, 179 F. App'x 633, 634 (11th Cir. 2006) (observing that "[t]he district court held that running was not a major life activity," but concluding that it was unnecessary to "decide this issue" because the claim failed on other grounds); *Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000) (observing that in a prior decision it had "affirm[ed] the trial court's finding of a physical impairment based on petitioner's heart disease, but held that a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks, as well as a lifting restriction, did not constitute a disability under the ADA." (citing *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220 (11th Cir. 1999) (assuming without deciding for purposes of the appeal that running qualifies as a major life activity))).  *But see Tompkins v. Mineral*, 302 F. App'x 666, 667 (9th Cir. 2008) ("[R]unning is not . . . a major life activity."); *Piascyk v. City of New Haven*, 64 F. Supp. 2d 19, 26–27 (D. Conn. 1999) ("Running, jumping, climbing stairs and ladders, and crawling simply are not sufficiently significant or essential functions to qualify as major life activities under the ADA."), *aff'd*, 216 F.3d 1072 (2d Cir. 2000).

---

[14] Independent research revealed only *Robbins v. Saturn Corp.*, 532 F. App'x 623 (6th Cir. 2013), an unpublished decision in which the Sixth Circuit observed:  "We have . . . held that foot, leg, and shoulder injuries that prevent the plaintiff from running, jumping, bending, and working more than eight hours a day do not rise to the level of a disability under the ADA."  *Id.* at 631 (internal quotation marks omitted) (citing a pre-ADAAA decision)).

As Plaintiffs correctly point out, the ADAAA "broadened the definition of what constitutes a disability." *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010). Although the ADAAA has not yet been the subject of extensive case law analysis, those courts that have analyzed it have "appl[ied] it broadly to encompass disabilities that previously might have been excluded." *Harty v. City of Sanford*, No. 11cv1041, 2012 WL 3243282, at *5 (M.D. Fla. Aug. 8, 2012) (collecting cases). Notwithstanding the pre-ADAAA out-of-circuit authority suggesting that running and jumping are not major life activities, the court is reluctant to find as a matter of law that they are not, given the more expansive coverage under the ADAAA, and the regulations cautioning that the court's focus should be primarily on whether covered entities "have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iii). The court will assume without deciding, therefore, that running and jumping are major life activities.

Finally, the Board does not seriously question the evidence that A.M. was substantially limited in her ability to run or jump without pain. Rather, the Board argues that A.M.'s ability to run or jump is not substantially limited because any physical limitations A.M. had with respect to those activities did not impact her ability to receive a high school education. But the ADA's implementing regulations focus on the effect of the impairment on the individual's life activities,

26

not educational activities, and permit a broad-based comparison between the ability of that individual to perform a major life activity "as compared to most people in the general population," not most people in an educational setting.   29 C.F.R. § 1630.2(j)(1)(ii).  Given this regulatory definition and absent the Board's citation to any authority to support its position, the court declines to adopt it.

In sum, the first element of Plaintiffs' claim – requiring that A.M. is an individual with a disability – is assumed for purposes of the summary judgment analysis.

## B.     **Harassment Based Upon a Disability**

The Board argues that Plaintiffs cannot produce evidence that A.M. was harassed based upon any disability.  The Board focuses primarily on Brandon's derogatory remarks to A.M. about her weight and Brandon's testimony that he was unaware that A.M. walked with a limp.   It argues that Brandon's testimony demonstrates that any harassment A.M. suffered was not based upon any impairment related to her early childhood diagnosis of Blount's Disease.  It argues further that, in any event, A.M. was not disabled, and, thus, any harassment was not based upon any disability.  These arguments are not persuasive.

In the first instance, the Board's argument ignores Virginia's deposition testimony that A.M.'s peers taunted her not only because she was overweight but also because of the way she walked.  Additionally, as discussed above, the court has assumed, without deciding, that A.M.'s limited mobility and weight qualify as

ADA disabilities; hence, the Board's arguments challenging A.M.'s proof with respect to her disabilities have no force at this point.  The court declines, however, to resolve this element for or against the Board on summary judgment and instead finds that it suffices to assume without deciding that the harassment A.M. endured was based upon her disabilities.

**C.    Severe or Pervasive Harassment**

The Board also argues that any disability-based harassment was not sufficiently severe or pervasive that it altered the conditions of A.M.'s educational opportunities.  "In the context of student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to education."  *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003) (citing *Davis*, 526 U.S. at 650). "Whether [disability] oriented conduct rises to the level of actionable harassment often depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved."  *Id.*

As the Board points out, some of the harassment allegations in the Complaint find no substantiation in the summary judgment record.  Discovery did not bear out admissible evidence that A.M. was the object of "pig races" or that her peers locked her in a janitor's closet and "stripped down" her pants in front of other peers.    (Compl. ¶¶ 45–46; *see, e.g.*, Virginia's Dep. 46, 55, 58–59

28

(recounting no knowledge of an incident where A.M. was "pantsed," locked in a closet, or subjected to a pig race); Brandon's Dep. 58, 94 (testifying that he had never heard of a pig race and was unaware of other students having locked A.M. in a room); Lewis's Aff. 5 (attesting that she had "never heard the term 'pig race' and do[es] not believe that any such activity could have occurred on [her] bus").)

Discovery did bear out, however, that on a daily basis multiple students hurled insults at A.M. based upon her weight (*e.g.*, "fat," "fatty," "fat bitch," "fat ass") and her limp and that A.M. had to endure this daily name-calling for the duration of her ninth- and tenth-grade years at Jemison High School.  The court recognizes that admissible evidence of acts of *physical* bullying is essentially non-existent, but it cannot readily acquiesce in the Board's argument that the duration and frequency of the derogatory remarks that A.M., a young teenager of impressionable years, had to endure amount to nothing more than "simple acts of [non-actionable] teasing and mere name-calling."  *Hawkins*, 322 F.3d at 1288. Moreover, it is notable that if Plaintiffs were able to prove that the two school years of harassment caused A.M. to commit suicide, then it logically follows that the consequences of the disability-based harassment – A.M.'s death – resulted in the complete denial of access to all education.[15]

---

[15] Plaintiffs offer Michael D. Freeman, Ph.D., as an expert in the fields of medical epidemiology and forensic epidemiology for his conclusion that "bullying was the likely cause of A.M.'s suicide, to a reasonable degree of scientific certainty."  (Doc. # 48-1, at 15.)  Mr. Freeman's testimony is the subject of a motion to exclude.  It is unnecessary to rule on the

The court need not wrestle with these issues, however, as it again will assume without deciding that Plaintiffs have raised a genuine dispute of material fact whether the harassment was sufficiently severe or pervasive and objectively offensive that it denied A.M. equal access to education.  Even if it is assumed that A.M. was the victim of severe or pervasive, and objectively offensive, disability harassment that negatively affected her access to education, Plaintiffs have not raised a genuine dispute of material fact that the Board had actual knowledge of the possibility of any disability harassment toward A.M.

## D.   <u>Actual Knowledge of Disability Harassment</u>

The Board contends that Plaintiffs cannot show that an appropriate person employed by the Board had actual knowledge of the alleged disability harassment against A.M.   "An 'appropriate person' must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred."  *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)).

### 1.   *An Appropriate Person*

"An 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination."  *Gebser*, 524 U.S. at 290.   The first task is to identify who Plaintiffs contend is an

---

motion to exclude in order to resolve the summary judgment motion, given the absence of evidence that an appropriate person had actual notice of and acted with deliberate indifference to the possibility of disability harassment targeted against A.M. (discussed *infra*).

"appropriate person."  That issue is not entirely clear because Plaintiffs' brief omits any discussion of which school officials they contend qualify as appropriate persons, but Plaintiffs' list arguably could include unnamed teachers, one named science teacher (Jill Easterling), a physical education teacher (Leighsa Robinson), a bus driver (Joann Lewis), and the assistant principal (Donna Giles).  The Board concedes that Ms. Giles is an appropriate person (Doc. # 46, at 20),[16] focusing instead on her lack of actual knowledge of any disability harassment toward A.M., and that concession is accepted for purposes of the summary judgment analysis. The Board contends, however, that Plaintiffs cannot produce admissible evidence demonstrating any other school official is an appropriate person.

In response to the Board's assertions, Plaintiffs remain silent.  Plaintiffs do not address whether A.M.'s teachers or A.M.'s bus driver are appropriate persons or present a factual basis for making that assessment, notwithstanding clear precedent that "the ultimate question of who is an appropriate person is necessarily

---

[16] To be precise, the Board contends that the only "appropriate persons" are the principal and the assistant principal.  *See KB v. Daleville City Bd. of Educ.*, 536 F. App'x 959, 962–63 (11th Cir. 2013) ("[W]e have not hesitated in concluding that principals, as the highest ranking school officials present at schools every day, are high enough on the chain of command to impute liability to the School Board" under Title IX (citation and internal quotation marks omitted)).  Plaintiffs do not contend that the principal, who now is deceased, had actual notice of the possibility that A.M.'s peers bullied A.M. on the basis of her disabilities; hence, it is unnecessary to address whether the principal of Jemison High School is an appropriate person.  It is notable, though, that with respect to the principal's response to the report he received of Brandon's teasing of a different student, the principal disciplined Brandon by requiring him to attend twenty days in alternative school.  The evidence suggests, therefore, that when the principal had actual notice of bullying, he did not ignore it, but imposed disciplinary action against the offending student.

a fact-based inquiry because officials' roles vary among school districts." *Doe v. Sch. Bd. of Broward Cnty. Fla.*, 604 F.3d 1248, 1256 (11th Cir. 2010).  Plaintiffs merely make an unsupported assumption that any "district employee[ ]" will suffice, but that assumption is insufficient to get this case beyond summary judgment.  As explained by the Seventh Circuit:

> We decline simply to name job titles that would or would not adequately satisfy this requirement.  School districts contain a number of layers below the school board:  superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators.  Different school districts may assign different duties to these positions or even reject the traditional hierarchical structure altogether.  Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry.

*Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999); *see also Santiago*, 655 F.3d at 75 ("Although it mentions [the plaintiff's] teacher and the school social worker, the complaint contains nothing that suggests that either of them comes within Title IX's 'appropriate person' taxonomy.").  With respect to teachers, in *Hawkins*, a Title IX case in which second-grade female students in a Florida public school system alleged that a male peer sexually harassed them for several months, the Eleventh Circuit observed that it was an open question "whether notice to a teacher constitutes actual knowledge on the part of a school board."  322 F.3d at 1286.  The issue of whether a teacher can qualify as an appropriate person remains open after *Hawkins* because *Hawkins* was

32

resolved against the plaintiffs on other grounds.  The Eleventh Circuit recognized nonetheless that the inquiry is fact dependent:  "In order to answer the question [of whether the students' teacher is an appropriate person], it would be necessary to examine how Florida organizes its public schools, the authority and responsibility granted by state law to administrators and teachers, the school district's discrimination policies and procedures, and the facts and circumstances of the particular case."[17]  *Id.*

*Hawkins* elucidates the factual void in the summary judgment record of which Plaintiffs bear the consequences.  Plaintiffs cite no evidence that sheds light on what authority A.M.'s teachers or bus driver had to take corrective measures in response to complaints of peer-on-peer disability harassment and, as stated, make no cogent argument that these individuals qualify as appropriate persons.[18]  Plaintiffs also point to no evidence as to how Alabama organizes its public schools,

---

[17] The *Hawkins* court also observed that *Gebser*'s pronouncement in the context of teacher-student harassment – *i.e.*, that an appropriate person is a school official who has "authority to address the discrimination and to institute corrective measures" – may in the context of student-peer harassment result in "a much broader number of administrators and employees [who] could conceivably exercise at least some control over student behavior."  322 F.3d at 1287.

[18] Ms. Lewis, the bus driver, had only limited disciplinary authority, as she testified at her deposition.  Plaintiffs do not cite this testimony, and the court is not obligated to search the record in support of evidence for either side or to formulate arguments on a party's behalf.  The testimony is merely noted, as is *Staehling v. Metropolitan Government of Nashville & Davidson County*, No. 3:07cv797, 2008 WL 4279839, at *10 (M.D. Tenn. Sept. 12, 2008), in which the court found that "[a] school bus driver is not an 'appropriate person' with authority for purposes of Title IX liability."

the authority and responsibility granted by state law to administrators and teachers, whether there are written policies that designate specified school officials as having the requisite authority, or any other facts and circumstances.[19]

The analysis could conclude here – as to all school officials but the assistant principal – for failure of Plaintiffs to raise a genuine dispute of material fact as to whether A.M.'s teachers and her bus driver are appropriate persons. Nonetheless, the analysis proceeds as summary judgment also is due the Board on additional grounds.

## 2.   *Actual Knowledge*

"An 'appropriate person' must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred."[20] *Williams*, 477 F.3d at 1293 (quoting *Gebser*, 524 U.S. at 290). The substance of the notice provided must be adequate to alert the appropriate person "of the possibility of [A.M.'s disability] harassment" by her peers. *J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254, 1255–56 (11th Cir. 2012) (citation and internal quotation marks omitted). Complaints that are "too general" are insufficient to provide actual notice. *Hawkins*, 322 F.3d

---

[19] There is affidavit testimony from the superintendent that the Board timely complied with Alabama's "first law" addressing student harassment, titled the Student Harassment Prevention Act, Ala. Code § 16-28B-1, by adopting an anti-harassment policy, but the Act's compliance deadline and the policy post-date A.M.'s death and, thus, are not particularly helpful for the appropriate-person analysis. (Hayden's Aff. 1–2.)

[20] While the parties have pointed to no evidence or made any argument that the Board had actual notice that A.M. potentially was suicidal, it is worth noting that the issue "is not whether appropriate persons had actual notice that [A.M.] was a suicide risk, but whether [the Board] had actual notice of disability harassment of [A.M.]." *Long*, 2012 WL 2277836, at *29.

at 1285. *J.F.K.*, a teacher-student Title IX sexual harassment case, provides guidance as what constitutes adequate notice. *See* 678 F.3d at 1260–61. There, the Eleventh Circuit held that although the principal knew the teacher's conduct toward a student was "inappropriate" and "devoid of professionalism" and "reeked of immaturity," the principal had no knowledge that the conduct was of a sexual nature, and, thus, the notice "was not enough to put the principal on actual notice that there was a risk of sexual harassment." *Id.*; *see also Gebser*, 524 U.S. at 291 (affirming summary judgment because a teacher's inappropriate comments were "plainly insufficient to alert the principal to the possibility" that the teacher was involved in a sexual relationship with a student).

To show actual knowledge, Plaintiffs argue, in the discussion section of their brief, that the "harassment was open and obvious on the school bus, in the hallways, in the cafeteria and in the gym" such that a reasonable jury could infer that any school employees in those areas witnessed the harassment. (Doc. # 57, at 14.) They also assert that "multiple teachers witnessed the harassment" and that a student reported the harassment of A.M. to multiple teachers. (Doc. # 57, at 14.) Moreover, Plaintiffs suggest, in their statement of facts, that Ms. Giles (the assistant principal), Ms. Robinson (the physical education teacher), and Ms. Lewis (the bus driver) had actual notice. (Doc. # 56, at 5.) None of these arguments prevails.

### a.    Open and Obvious Theory

Plaintiffs do not cite any authority to support their "open and obvious" theory.  That failure is not surprising because the argument is premised on a theory of constructive knowledge.  And *Davis* expressly rejected constructive notice as a theory of liability under Title IX for student-on-student harassment.  *See Davis*, 526 U.S. at 642 (rejecting a "negligence" standard for imposing liability on Title IX schools for failing to respond to harassment of which school officials "should have known"); *see also Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (rejecting an assertion of actual notice of peer-on-peer harassment on the part of the school because the assertion of notice was based only on the fact that the teachers must have noticed the harassment because "teachers constantly supervise kindergartners," not on any fact of actual notice).

### b.    Unnamed Teachers

With respect to unnamed teachers, the Complaint alleges that numerous teachers witnessed acts of bullying against A.M., and, as stated, Plaintiffs' summary judgment briefing echoes those allegations.  But this litigation has passed the motion-to-dismiss stage, and Plaintiffs do not cite any evidence that reveals the identity of these teachers, what they personally saw, when they saw it, or where they saw it.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (A motion for summary judgment looks to "pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial."). Plaintiffs fail to raise a genuine dispute of material fact that any teacher personally witnessed any bullying against A.M.

### c.  Named School Officials

The analysis turns to whether any teacher or other school official received a report of disability harassment against A.M.   Plaintiffs argue that a student, presumably Virginia, reported bullying against A.M. to multiple teachers, but Virginia names only one teacher, Ms. Easterling.   Thus, the court will examine whether there is evidence raising a genuine dispute of material fact that the assistant principal (Ms. Giles), the science teacher (Ms. Easterling), the physical education teacher (Ms. Robinson), or the bus driver (Ms. Lewis) had actual notice.

Ms. Giles presents affirmative evidence that she had no knowledge of any bullying against A.M. and that she never received a complaint of peer-on-peer disability-based harassment (or any other bullying activity) against A.M., from either a student, a teacher (including A.M.'s guidance counselor and STEP teacher), or A.M.'s parents.  (Giles's Aff. 3, 4, 6.)  Plaintiffs attempt to refute Ms. Giles's affidavit testimony by relying on the deposition testimony of Brandon. However, Brandon's testimony cannot create a genuine dispute of material fact as to Ms. Giles's knowledge because it is not based upon Brandon's personal

knowledge, but rather amounts to hearsay and speculation.[21]   A plaintiff cannot overcome summary judgment based upon inadmissible hearsay or speculation.  *See Macuba*, 193 F.3d at 1322 (inadmissible hearsay); *Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (speculation).

Brandon testified that three to six months prior to A.M.'s death, two male classmates told him that Ms. Giles summoned them to her office because A.M. "went to Ms. Giles."  (Brandon's Dep. 103–04.)  However, Brandon cannot testify about what his peers told him because he has no personal knowledge of the event and his testimony about what his classmates told him is hearsay.  Moreover, Brandon's testimony is speculative because the two classmates did not tell him why Ms. Giles summoned them to her office or what happened as a result of their meeting with Ms. Giles.  Brandon merely speculates that the topic of conversation was bullying toward A.M.  (Brandon's Dep. 104–05 ("They never told me what [the meeting] was for or what happened.").)   Brandon's testimony clearly is insufficient to establish Ms. Giles's actual knowledge of disability harassment against A.M., and Plaintiffs proffer no other evidence.  Accordingly, the evidence,

---

[21] Federal Rule of Civil Procedure 56(c)(4) provides that "an affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge [and] set out facts that would be admissible in evidence."  In *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), the Eleventh Circuit held that this procedural rule "also applies to testimony given on deposition."  *Id.* at 1323.  Thus, an out-of-court statement made to a deponent is "admissible in evidence" only if it is "admissible at trial for some purpose."  *Id.*

viewed in the light most favorable to Plaintiffs, establishes that Ms. Giles did not have actual knowledge that A.M. possibly was a victim of disability harassment.

Turning to Ms. Robinson, she provides affidavit testimony that "A.M. never reported to [her] that she was being bullied or harassed or picked on in any of [her] classes."  (Robinson's Aff. 3.)   Plaintiffs again rely solely on Brandon's deposition testimony to refute Ms. Robinson's affidavit testimony, but again Brandon's testimony is inadmissible for the point offered.  Brandon testifies that he "believe[s] [A.M.] told [Ms. Robinson] one time" about the bullying because on a particular day when students had called her names, A.M. went to Ms. Robinson's office, and after that Ms. Robinson "made [the students] sit down for the rest of the period."[22]  (Brandon's Dep. 100.)  Brandon candidly admits, however, that he does not know what A.M. told Ms. Robinson.  Rather, "in [his] mind," he believed that A.M. went to Ms. Robinson's office to report the bullying.  (Brandon's Dep. 100.)  At his deposition, Brandon was compelled upon questioning to speculate as to what, if anything, transpired on that day between A.M. and Ms. Robinson, but district courts are not permitted to rest a summary judgment denial on speculation.  According to Brandon, Ms. Robinson did not provide the class with any

_____

[22] Ms. Robinson testified that usually when she "directed the students in any of [her] classes to sit in the bleachers and be quiet, it was typically in response to the students' being too loud in the gymnasium, which has very bad acoustics."  (Doc. # 35-5.)  Plaintiffs point to no evidence to refute that reasoning.  Ms. Robinson further attests that her "office is not located inside of the gym, so if a student was present in the gym, he or she would be unable to see whether another student entered or exited [her] office."  (Robinson's Aff. 3.)

justification for the punishment of sitting on the bleachers, and there is no evidence of what allegedly occurred in Ms. Robinson's office between Ms. Robinson and A.M.  For instance, there is no evidence of what A.M. told Ms. Robinson and that, if she did report any bullying conduct, what the substance of that report was. Accordingly, Plaintiffs fail to raise a genuine dispute of material fact that Ms. Robinson had actual notice of the possibility of disability harassment against A.M.

Virginia believes she confided in Ms. Easterling about the bullying against A.M.[23]  But her deposition testimony about the substance of what she told Ms. Easterling is skeletal, and the substance is important for the analysis.  Virginia does not remember what she told Ms. Easterling, and Plaintiffs do not cite any other evidence from which to gauge Ms. Easterling's level of knowledge.  Accordingly, Plaintiffs fail to raise a genuine dispute of material fact that Ms. Easterling had actual notice of the possibility of disability harassment against A.M.

As to Ms. Lewis, A.M.'s bus driver, it is undisputed that she received notice during A.M.'s tenth-grade year that Brandon was "picking on" A.M.  (Lewis's Aff. 4.)  Plaintiffs point to no evidence, however, indicating that Ms. Lewis received information regarding the nature of Brandon's teasing.  Ms. Lewis cannot recall exactly what she heard or saw (Lewis's Aff. 4), and the Moores do not fill in that

---

[23] Ms. Easterling attests that "A.M. never complained to [her] that she was being picked on, harassed, or bullied at school or on the bus."  (Easterling's Aff. 2.)  That attestation is undisputed.  Ms. Easterling also denies that Virginia reported to her that "A.M. was bullied or harassed."  (Easterling's Aff. 2.)  Although that fact is disputed, the dispute turns out to be immaterial.

knowledge gap.  (Jim Moore's Dep. 132–34; Jill Moore's Dep. 110.)  In fact, Ms. Lewis's deposition testimony, which Plaintiffs fail to cite, suggests that Ms. Lewis did not know that Brandon had picked on A.M. because of her weight.  (*See* Lewis's Dep. 30, 38.)  This leaves unanswered whether Ms. Lewis knew that Brandon possibly was bullying A.M. on the basis of her presumed disabilities. Plaintiffs fail to demonstrate that the substance of the notice to Ms. Lewis was sufficient to alert her of the possibility of disability harassment against A.M.

### 3.    *Summary*

With the exception of Assistant Principal Giles, whom the Boards concedes is an appropriate person, Plaintiffs fail to offer any evidence to show that A.M.'s teachers and bus driver qualify as appropriate persons.  Plaintiffs cannot establish actual knowledge on the part of the Board on the basis of their open and obvious theory because actual knowledge, not constructive knowledge, is the standard. Plaintiffs also fail to raise a genuine dispute of material fact that Ms. Giles, Ms. Robinson, Ms. Easterling, or Ms. Lewis, assuming *arguendo* that the latter three are appropriate persons, had actual knowledge notice of the possibility that A.M.'s peers had subjected her to disability harassment.  Plaintiffs offer no other argument or theory for finding that that an appropriate person had actual knowledge of the discrimination, *i.e.*, disability harassment, that they allege A.M. endured. Accordingly, the Board is entitled to summary judgment on Plaintiffs' ADA and § 504(a) disability harassment claims for failure to raise a genuine dispute of

material fact that the Board had actual knowledge of the possibility that A.M.'s peers had subjected her to disability harassment.

**E.     Deliberate Indifference**

The Board cannot be held liable for disability harassment of which it had no actual notice, and this is the only conclusion that a sifting of the summary judgment evidence yields.   But the court will take a moment to discuss the responses that Ms. Easterling and Ms. Lewis took when they received information about non-specific bullying against A.M.

An appropriate person not only must have actual notice of the possibility of disability harassment, but also must act with deliberate indifference to that known harassment.   *See Broward Cnty.*, 604 F.3d at 1259.   In *Davis*, the Supreme Court explained that a Title IX funding recipient is "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is "clearly unreasonable" in light of the known circumstances.   526 U.S. at 648.   Because the standard is more than "a mere reasonableness standard," the Supreme Court emphasized that, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a matter of law."   *Id.* at 649.   Indeed, "[t]he deliberate indifference standard is a high one.   Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ."   *Doe on Behalf of Doe v. Dallas Indep.*

42

*Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998); *see also Doe*, 604 F.3d at 1259 ("Deliberate indifference is an exacting standard."). In *Davis*, the Supreme Court recognized, however, that deliberate indifference may exist where the defendants had actual notice of possible harassment, but "made no effort whatsoever either to investigate or to put an end to the harassment." *Davis*, 526 U.S. at 654.

Plaintiffs do not contend that Ms. Easterling and Ms. Lewis did nothing in response to a report of bullying against A.M. According to Virginia, after she spoke to Ms. Easterling, Ms. Easterling would "watch[ ] over [A.M.]" from her classroom door while A.M. was in the hallway. (Virginia's Dep. 54, 55.) Plaintiffs point to no evidence and make no argument that Ms. Easterling observed any disability harassment against A.M. but took no action during those watchful times. There is no evidence from which it can be inferred that Ms. Easterling, based upon what she knew, acted clearly unreasonably in her response to Virginia's report that A.M. was the subject of peer-to-peer bullying.

Ms. Lewis also undisputedly implemented disciplinary action after she received a report that Brandon had been "picking on" A.M. on the bus. Ms. Lewis separated Brandon from A.M. and moved Brandon to a seat at the front of the bus for two weeks so she could monitor him. After that, Ms. Lewis "never saw any misconduct by [Brandon] directed at A.M. after [Brandon] moved back to his seat." (Lewis's Aff. 5.) Based upon the summary judgment record and the circumstances known to Ms. Lewis, her actions were not clearly unreasonable as a

matter of law when she took no additional disciplinary measures against Brandon after observing no further harassment and receiving no other reports of harassment against A.M., from A.M., from another student, or from A.M.'s parents.  While Plaintiffs indicate that more should have been done by the Board, "a claim that the school system could or should have done more is insufficient to establish deliberate indifference."  *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007) (citing *Davis*, 526 U.S. at 648).  In short, the evidence is insufficient to raise a genuine dispute of material fact that either Ms. Easterling or Ms. Lewis acted with deliberate indifference, even if ultimately their response did not stop the disability harassment.[24]

## V.  CONCLUSION

The standard for holding the Board liable under the ADA and the Rehabilitation Act for peer-on-peer disability harassment is rigorous.  Plaintiffs have failed to raise a genuine dispute of material fact that the Board, through "appropriate" school officials, had actual knowledge of the possibility of disability harassment against A.M.  The court recognizes that A.M.'s parents have suffered an unbearable tragedy and that proving their case is difficult without A.M. here to

---

[24] To the extent that Plaintiffs fault Ms. Easterling or Ms. Lewis for failing to report the alleged disability harassment to the assistant principal or principal, the First Circuit has held that an "empty allegation that a school employee 'failed to report' harassment to someone higher up in the chain of command who could have taken corrective action is not enough to establish institutional liability."  *Santiago*, 655 F.3d at 75.  "Title IX does not sweep so broadly as to permit a suit for harm-inducing conduct that was not brought to the attention of someone with authority to stop it."  *Id.*

tell her side of the story personally.   However, in pursuing their disability harassment claim under the ADA and § 504(a) against the Board, Plaintiffs bear the burden of submitting summary judgment evidence that creates a triable issue of fact.  They have failed to do so, and, thus, their claims cannot survive.

Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 35) is GRANTED.   A separate final judgment will be entered.

DONE this 3rd day of March, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
